604 So.2d 1079 (1992)
In the Interest of C.R., a Minor.
No. 90-CA-0220.
Supreme Court of Mississippi.
June 10, 1992.
William B. Alexander, Jr., W. Brooks Alexander, III, Alexander Johnston & Alexander, Cleveland, for appellant.
Michael C. Moore, Atty. Gen., Harold J. Barkley, III, Sp. Asst. Atty. Gen., Onetta Whitley, J.D. Woodcock, Sp. Asst. Attys. Gen., Jackson, for appellee.
En Banc.
PITTMAN, Justice, for the Court:
This youth court appeal reaches the Court from proceedings held in the County Court of the First Judicial District of Bolivar County, Mississippi. The trial judge found that C.R., a minor, was an educationally neglected child and ordered that she be placed in the Mississippi School for the Deaf. In perfecting this appeal, C.R.'s mother, Ms. R., asserts that the youth court was clearly in error when the court ruled that C.R.'s best interest would be served by placing her in a public institution. Finding merit in the arguments put forth by Ms. R., we reverse this cause and remand it to the youth court for further proceedings.

*1080 I.
On December 12, 1988, social worker Terry Haltom of the West Bolivar County Department of Human Services filed a petition in the County Court of the First Judicial District of Bolivar County, Mississippi, Youth Court Division, in the interest of C.R., a minor. The petition stated that C.R. was a twelve-year-old deaf, black female who reported to her school teacher that she had been sexually abused by her mother's boyfriend. The petition requested that a hearing date be immediately set to protect the interest and the welfare of the minor child.
On December 14, 1988, a shelter hearing was held in the Youth Court of Bolivar County. At that proceeding, the trial judge found that C.R. was an abused child and that she should have no contact with James Lee, the man responsible for the abuse in question. Further, the trial judge ordered that the legal custody of C.R. be placed in the West Bolivar County Department of Public Welfare with Ms. R. retaining the temporary physical custody of her child.
On June 13, 1989, six months after the first hearing, social worker Vanessa Long petitioned the Youth Court of Bolivar County to hold an evidentiary hearing to consider the best interests of the minor child. On July 24, an adjudicatory hearing was held in this cause with all parties presenting witnesses to aid the court in its determination. First, Ms. R. presented evidence concerning the home life of C.R. and her family. Friends and neighbors of the R. family testified that C.R. was a very happy child and that she was close to her mother and other siblings. Mary Johnson, a neighbor, testified that Ms. R. was a good mother and that her children were happy, well-fed, and always attended school. She stated that the R. home was very clean with plenty of room for the six children. Next, Mary Lee Hall, the person responsible for driving C.R. to school each day and who spent ninety minutes each day with C.R., informed the court that C.R. was a very well-adjusted little girl and that she was always well-clothed, clean, and happy. Hall related that she had helped the R. family recover from two recent home fires, that she would continue to help Ms. R. and her family in any way that she could, and that C.R. came from a nice family.
After the testimony of the friends and neighbors of the R. family, Ms. R. presented evidence from C.R.'s school teachers and other education officials. Addye Sue Smith testified that she was C.R.'s teacher for more than two years while C.R. attended class in the Coahoma County School System. She stated that C.R. was a very happy young girl and that she had made substantial progress while in the hearing-impaired program. Smith testified that the Coahoma County School System could provide C.R. with an excellent education because of the excellent curriculum, teaching staff, and the very low student-to-teacher ratio. Smith believed that it would be in the best interest of C.R. to remain in the local school system where she could live with her family.
School psychologist Gussie Farris agreed with the sentiments of Addye Sue Smith by stating that living at home would be the best option for C.R. as long as the home environment was acceptable. Farris stated that home placement was a more mainstream setting than an institution because it provided the opportunity to interact with the hearing world. Farris testified that C.R. had made excellent progress while in the Coahoma School System.
To controvert the evidence of Ms. R., the State called social worker Vanessa Long as a witness. Long testified that in May of 1989, she paid an unannounced visit to the home of Ms. R.'s sister where the family was staying temporarily. She stated that Ms. R. was not at home and that her children, supposedly under the supervision of Ms. R.'s sister, were alone and unattended. Vanessa Long testified that the house was in an unkept fashion and that there was no food in the kitchen. Because of this visit, the Welfare Department suggested to Ms. R. that she needed to house her family separately from her sister's family. Ms. R., who had been living with her sister because of a house fire, secured new housing *1081 and moved her family in accordance with the suggestion of the department.
After the testimony of the above witnesses, the trial judge recessed the July 24, 1989, hearing so that a psychological evaluation of C.R. could be performed. The hearing was reconvened on November 9, 1989 (eleven months after the first hearing with physical custody still with the mother). The evaluation of psychologist Dr. Charles Small was admitted into evidence. Dr. Small's report recommended that the minor, C.R., be admitted to the Mississippi School for the Deaf as a residential student based upon her psychological profile.
Upon the admission of Dr. Small's evaluation, respondent called C.R.'s new school teacher as a witness. Peggy Nance testified that she felt that C.R. was receiving the best education possible while a student in the Coahoma County School System. She stated that the student-to-teacher ratio was very low and that C.R. was progressing in her studies. Nance related that once C.R. reached high school age, however, the Mississippi School for the Deaf would provide more vocational training than the Coahoma School System.
The final witness in the cause was the social worker assigned to C.R.'s case, Queen Coleman. Coleman testified that she had visited in the R.'s new residence and found it to be clean and very neat. She expressed concern that there was not enough food in the family's home but admitted that Ms. R.'s children appeared to be well-fed, clean and happy. Coleman testified that C.R. appeared to be very happy and stable in her home and school environment. She admitted that the original complaint of sexual abuse had been satisfied for more than a year.
After the parties rested in this cause, the trial judge determined that it would be in the best interest of C.R. to attend the Mississippi School for the Deaf. He found that C.R. had been the victim of "educational neglect" and that it would benefit her to be with other deaf children. Ms. R. has appealed this decision.

II.
Procedurally, we note that the lower court committed error by failing to conduct a separate and distinct dispositional hearing below. Under the mandates of the Mississippi Youth Court Act, before a child can be declared "abused" or "neglected," separate adjudicatory and disposition hearings must be held.
On June 13, 1989, social worker Vanessa Long filed her petition in the Youth Court of Bolivar County reasserting the charges of sexual abuse and requesting an immediate hearing to determine the best interests of the minor, C.R. A hearing on the petition was held on July 24, 1989, with both parties presenting evidence and a court reporter recording the testimony. In turn, the July proceeding was recessed so that a psychological evaluation could be completed on C.R. The hearing was reconvened on November 9, 1989, with the trial court finding that C.R. was an "educationally neglected" child and that she should be placed in the Mississippi School for the Deaf. Our question on appeal is whether a separate and distinct disposition hearing was conducted.
The July 24, 1989, hearing satisfies the requirement for an adjudicatory proceeding under the mandates of the Mississippi Youth Court Act. First, the hearing was held within 90 days of the filing of the petition under Miss. Code Ann. § 43-21-551 (1972). The petition was filed on June 13, 1989, and the hearing was held on July 24, 1989. The proceeding's postponement to November 9, 1989, is without consequence since § 43-21-551 provides that a hearing may be continued upon a showing of good cause. Therefore, the hearing was held within the time provided by the Youth Court Act.
Next the parties received notice of the hearing more than three (3) days before it was scheduled to begin under Miss. Code Ann. § 43-21-507 (1972). The list of clerk's papers found in the record of this matter notes that service of process was executed on July 5, 1989, and returned on July 8, 1989. As such, service of process *1082 was made within the time provided for by statute.
Finally, the July 24 and November 9, 1989, hearings were both recorded by a court reporter pursuant to Miss. Code Ann. § 43-21-203(7) (1981). Therefore, those proceedings met the statutory requirements for an adjudicatory hearing under the Mississippi Youth Court Act.

If the July 24, 1989 Hearing Was an Adjudicatory Hearing, Was There a Separate and Distinct Dispositional Hearing?
Under the provisions of the Youth Court Act, after a valid adjudicatory hearing is held, a separate and distinct disposition hearing is necessary. Section 43-21-601 of the Miss. Code Ann. (1972) provides that after a child has been adjudicated an abused child, "the youth court shall immediately set a time and place for a disposition hearing which shall be separate, distinct and subsequent to the adjudicatory hearing. The disposition hearing ... may be held immediately following the adjudicatory hearing unless a continuance is necessary... ." In the proceedings below, the youth court did not conduct a separate and distinct disposition hearing. The youth court judge determined, at the conclusion of the July 24/November 9 adjudicatory hearing, that C.R. should be placed in the Mississippi School for the Deaf. This disposition was not made at a separate hearing and, therefore, was contrary to the provisions of the Youth Court Act.
In In the Interest of J.E.J., 419 So.2d 1032 (Miss. 1982), this Court reviewed an appeal where the trial judge adjudicated J.E.J. to be a delinquent minor and ordered him to be placed in the custody of the Oakley Training School. On appeal to this Court, J.E.J. assigned error to the lower court's failure to hold a separate and distinct disposition hearing under the provisions of Miss. Code Ann. § 43-21-601 (1972). Finding merit in the appellant's argument, this Court reversed and remanded for a disposition hearing by the court below. The Court ruled:
The statute mandates that, after a child has been adjudicated a delinquent child, the Youth Court shall immediately set a time and place for a disposition hearing which shall be separate, distinct and subsequent to the adjudicatory hearing. It also provides that such hearing may be heard immediately following the adjudicatory hearing. Here, the court could have adjourned for fifteen (15) minutes, the entire record could have been offered in evidence and he could have entered a disposition order... .
We are of the opinion that the lower court erred in not following § 43-21-601, and that the judgment should be affirmed as to the adjudicatory part and should be reversed and remanded for a disposition hearing, as required by the statute.
Id. at 1034.
In In the Interest of I.G., 467 So.2d 920 (Miss. 1985), Justice Sullivan, for the Court, said:
"But insofar as Interest of J.E.J. stands for a strict application of the mandates of the Youth Court Act, this Court concludes that the failure of the youth court to inform the appellants at the outset that the second hearing was on adjudication of the general neglect charges, as required by § 43-21-557(1)(d), is reversible error. Much of the same evidence was used to adjudicate the appellants in contempt and to adjudicate their child to be neglected. The appellants were entitled to know for what purpose the evidence was being offered."
Id. at 924.
After finding that C.R. was a neglected child, the trial judge made the dispositive ruling that she should be placed in the Mississippi School for the Deaf. This decision was contrary to the provisions of the Youth Court Act and contrary to the application of that act by this Court in In the Interest of J.E.J. and In the Interest of I.G. Therefore, a reversal is required.

*1083 III.
In addition to her challenge on procedural grounds, Ms. R. suggests that the lower court was without sufficient support when ruling that C.R. was a neglected child. Our review of the record leads us to agree.
In the recent decision of In the Interest of T.L.C., 566 So.2d 691 (Miss. 1990), this Court stated the standard of review when a party challenges the sufficiency of the evidence supporting an adjudicatory or disposition order. That standard provides:
When a Youth Court makes an adjudication of neglect, this Court considers all the evidence before the Youth Court in the light most favorable to the State. In the Interest of M.R.L., 488 So.2d 788, 791 (Miss. 1986). If the evidence so considered is opposed to the finding of the Youth Court with such force that "reasonable men" could not have found as the Youth Court did by a preponderance of the evidence, this Court must reverse.
In the Interest of T.L.C., 566 So.2d at 701 (quoting Collins v. Lowndes County Public Welfare Department, 555 So.2d 71, 72 (Miss. 1989)).
When we consider the evidence presented in the proceedings below, we are convinced that the lower court reached the wrong decision. First, the State failed to show that C.R.'s home environment was dysfunctional or that she was in danger of future sexual abuse. In fact, all agreed that the original charge of abuse had been resolved for more than a year. Next, the State did not prove that C.R. was an "educationally neglected" child or that she was receiving a sub-standard education. The Coahoma county educators who testified in this cause agreed that the Coahoma County School System provided an excellent curriculum for the hearing-impaired. Certainly, C.R. was enrolled in the best public school situation available to her in her local community. It is doubtful that any child can be held to be "educationally neglected" within the meaning of the statute so long as the child is enrolled successfully in a school made available by public means where such school is all that is available in the child's home community. If the child is enrolled and performing (without interference from parents or guardians) in the best educational program the state or local district provides, that enrollment necessarily overcome allegations of "educational neglect". It may well be true that the child is happier at the Mississippi School for the Deaf, and we might advise the mother to leave the child at the Mississippi School for the Deaf. However, under the proof of this case, we can't command it. Considering these facts, we are convinced that the youth court improperly decided that C.R. would be in a "better" situation if she was a student at the Mississippi School for the Deaf. A court cannot remove a child from her home and family simply because a more desirable setting is available elsewhere. The court must first find a failure of the child's environment and then take steps to protect the minor's interests. In the instant case, the mother of C.R. had done all suggested to her by the Bolivar County Welfare Department. The person who had molested C.R. was barred from the household and, in fact, lived out-of-state. When it was suggested to C.R.'s mother that she needed different housing, the mother moved into a more satisfactory house. Ms. R. had enrolled C.R. in the best educational situation available to her in the community. Neither the Welfare Department nor the courts may simply find that a child could be placed in a more advantageous place and thereby terminate parental control. Indeed, for almost a year, the child was left with her mother in the home environment to which the Welfare Department objected. This permitted placement tends to deny the Welfare Department's argument that the child was neglected. Further, the mother continues to have actual physical custody when C.R. is on weekend or holiday break from the Jackson-located school for the deaf. We cannot simply decide that a school many miles away is better and remove the child from a parent or parents who are doing the best they can within their resources and who are taking full advantage of the best the state or local school has to offer. Here, we find that the lower court was without support when ruling that C.R. should be removed *1084 from her home. As a result, we reverse this cause on both substantive and procedural grounds. We reverse the finding that C.R. is "educationally neglected" and remand for further hearing and determination of the question of neglect of C.R., and we reverse and remand to the lower court for failure to follow Miss. Code Ann. § 43-21-601 (1972) so that a separate and distinct disposition hearing be had as required.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
McRAE, J., dissents with separate written opinion.
BANKS, J., not participating.
McRAE, Justice, dissenting:
This tragic case grew out of a complaint charging that a child had been sexually abused by her mother's boyfriend. As a result of hearings before the Youth Court, the child was found to be not only sexually abused, but also educationally neglected and in need of special institutional care for the treatment for a hearing disability. While I join the majority in its empathy for the mother's plight, I am more concerned with whether the Youth Court has fulfilled its responsibility in carrying out the mandates of the Youth Court Act and with the best interests of the child. Finding the Youth Court proceedings to be free of error and in harmony with the best interests of the child, I respectfully dissent.
The majority concludes that the lower court committed procedural error by failing to hold separate adjudicatory and dispositional hearings. I disagree. The record plainly reflects that the Youth Court addressed C.R.'s educational and disability needs on two separate occasions: July 24, 1989, and November 9, 1989. Although the record does not expressly refer to the proceedings on these dates as "adjudicatory" and "dispositional," the hearings were clearly adjudicatory and dispositional in nature. Both sides presented witnesses at the July 24, 1989 hearing, and the thrust of these witnesses' testimony concerned whether C.R. had suffered abuse through educational neglect. In contrast, the testimony received at the November 9, 1989 hearing primarily concerned whether C.R. should be placed in the custody of the Mississippi School for the Deaf.
The July 24 hearing was obviously "adjudicatory" since it dealt with whether C.R. was abused or neglected; the November 9 hearing was "dispositional" in that it focused not on whether C.R. was abused, but rather on what should be done with C.R., an educationally neglected child and one in need of special care concerning a disability.
Section 43-21-601 implies that a disposition hearing can occur only after a child has been adjudicated neglected or abused. This requirement is satisfied since, although the court did not enter an order following the July 24 hearing, the court had already determined C.R. to be an abused child following the November, 1988, shelter hearing. Section 43-21-601 does not require that adjudicatory and disposition hearings result in separate and distinct orders; the statute only requires that the hearings themselves be separate. It is also noteworthy that C.R.'s two consecutive guardians ad litem, Gwendolyn Thomas and Daniel Griffith, have raised no objections whatsoever to the proceedings below.
The Youth Court's disposition of C.R.'s case is perfectly in keeping with § 43-21-611 which states:
If the youth court finds at the disposition hearing that a delinquent child, a child in need of supervision, a neglected child, an abused child or a dependent child is also a child in need of special care, the youth court may, in its discretion, make any appropriate additional disposition designed for the treatment of the disability or infirmity, which may include commitment, as a priority case, to any state institution providing care for that disability or infirmity.
Based on the evidence presented, the lower court determined that C.R. was neglected and in need of special care. Pursuant to § 43-21-611 the court ordered C.R. *1085 committed to a state institution where she could receive proper training and care. By second guessing the Youth Court's disposition of the case, the majority has encroached upon the discretionary powers granted to the trial court in § 43-21-611.
I also take issue with the majority's finding that the record contains no evidence to support the youth court ruling that C.R. was a neglected child. To the contrary, a review of the record shows that beyond question, this child was receiving neither the education nor the treatment needed to adequately cope with her disability. Guy Millis, coordinator of special services for the Coahoma County School District, testified that it might be in the best interest of C.R. for her to go to the MSD upon finishing elementary school since MSD has superior counseling and support services and is able to provide vocational training which is unavailable to C.R. in the Coahoma County School System. At the time of the hearing on November 9, 1989, C.R. had already left elementary school and entered junior high school. Peggy Nance, C.R.'s teacher at Coahoma Junior High School, also conceded that the MSD provides vocational programs superior to those provided by the Coahoma County public schools. Gussie Farrish, the school psychologist for the Coahoma County School District, estimated that C.R. could achieve a sixth grade level in academics by the time she left the Coahoma County School System at age twenty-one. Dr. Charles Small, a clinical psychologist, conducted a psychological evaluation of C.R. and recommended that she be referred to the MSD as a residential student. Queen Coleman, a social worker assigned to the case, testified that in her view, C.R. would benefit by associating with other children like herself at the MSD and C.R.'s attendance at the MSD would teach her to "take care of herself." Regarding C.R.'s home life, Addye Sue Smith, a teacher for the hearing impaired for the Coahoma County School System, testified that although C.R. appeared happy and well adjusted, the child had evidenced a "hygiene problem." Smith had contacted C.R.'s mother concerning the problem and the mother allegedly informed Smith that she did not have enough money to buy hygiene aids such as toothpaste and deodorant. Further, the mother admitted that she had refused to allow social workers to review her budget management and that she had been placed on probation for being hostile toward social workers. She also admitted that neither she nor anyone else in C.R.'s family has learned to communicate with sign language on even the most basic level. The evidence supporting the Youth Court's judgment is clearly "substantial."
When reviewing factual determinations of a youth (county) court upon direct appeal, the scope of our review is limited by the same substantial evidence/manifest error rule as applies generally to the findings of trial courts. See W.H. Hopper & Assocs. v. DeSOTO County, 475 So.2d 1149, 1152 (Miss. 1985) (substantial evidence/manifest error rule applies to appeals from county court). Consequently, we are powerless to disturb the trial judge's ruling with regard to child custody unless the record reflects no substantial evidence to support it. Stevison v. Woods, 560 So.2d 176, 179 (Miss. 1990); Phillips v. Phillips, 555 So.2d 698, 700 (Miss. 1989). In this context, for us to hold that no substantial evidence supports the trial court's ruling, we must find that when considering "all the evidence ... in the light most favorable to the state[,] ... reasonable men could not have found as the Youth Court did by a preponderance of the evidence." In the Interest of T.L.C., 566 So.2d 691, 701 (Miss. 1990); see In the Interest of M.R.L., 488 So.2d 788, 791 (Miss. 1986). After reviewing the record in this case in the light most favorable to the state, I cannot say that the trial court manifestly erred in finding that the interests of C.R. would be best served by placing her in the custody of the Mississippi School for the Deaf.
Even if the state had put on no evidence at all concerning the undesirability of returning C.R. to the custody of her mother, the trial court would not have erred in refusing to do so: C.R.'s mother has never filed a petition for modification of custody pursuant to Miss. Code Ann. § 43-21-313 (1972). Following a shelter hearing in December *1086 of 1988, the Youth Court placed C.R. in the legal custody of the West Bolivar County Department of Public Welfare as a result of her having been sexually abused by her mother's boyfriend. The order specified that C.R. was to remain temporarily in the physical custody of her mother until such time as the "Welfare Department has made arrangements for placement of [C.R.] in a special school designed for the deaf."
In the case sub judice, the Youth Court has merely acted in accordance with the December 1988 custody order. Neither the order of November 1988 nor the order of November 1989 were issued with prejudice. Even now, C.R.'s mother is fully entitled to file a petition for modification and to introduce evidence indicating that a change in circumstances make continued custody by the state unnecessary. The Youth Court did not manifestly err and did not abuse its discretion by placing C.R. in the custody of the Mississippi School for the Deaf.
The wisdom of the Youth Court's decision is reinforced by the testimony received at a hearing on November 20, 1990 in which the court reviewed C.R.'s progress. In its summary of the proceedings, the court stated:
C.R. was enrolled at MSD on or about April 26, 1990; her academic progress is satisfactory, considering her history of educational neglect; all reports thereon are positive. Her social adjustment is excellent. She exhibited excitement in her translated responses to questions by the Court and Counsel. She is participating in basketball, and after Court expressed disappointment at having to miss a game today in order to be in Court. All in all, her social environment is incomparably improved, and her response to it is gratifying.
I think we would be remiss to take the child out of the MSD. She has been at the MSD for over a year, is well adjusted, learning, and happy. She is getting what she needs now, which is something she was not getting in Bolivar County. The majority insists that "[w]e cannot simply ... remove the child from a parent or parents who are ... taking full advantage of the best the state ... has to offer." If the majority and C.R.'s mother truly wishes to take advantage of "the best the state has to offer," then the Mississippi School for the Deaf, not the county school system, would be their choice. Even the local school officials and teachers who testified below acknowledged the superior resources of MSD.
I can only conclude that to again disrupt C.R.'s life by retransferring custody would have a traumatic impact on the child.
I would affirm.